UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WANDA WYNN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:10CV1601 JAR |
| | ) |
| ASCENSION-HEALTH, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter comes before the Court on cross motions for summary judgment (ECF Nos. 44, 45). These motions are fully briefed and are ready for disposition.

## BACKGROUND

Ascension Health ("Ascension") sponsors the self-funded Ascension Health Long-Term Disability Plan ("Plan") for the benefit of eligible employees of St. Vincent's Medical Center ("St. Vincent") in Jacksonville Florida. (Ascension Health's Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment ("DSUMF"), ECF No. 46, ¶1).[1] The Plan is governed by the Employee Retirement Income Security Acts, 29 U.S.C. §§1002, *et seq*. ("ERISA"). (Id., ¶2). The Plan is administered by Ascension and provides that the administrator "shall have the discretionary authority to decide all questions arising in connection with the administration, interpretation and application of the Plan." (Id., ¶¶3, 4). The Plan also provides that Ascension can delegate its authority to other administrators and, pursuant thereto, Ascension delegated its authority

---

[1] Both parties filed statements of uncontroverted material facts. Plaintiff, however, did not file any objections to Defendant's statement of uncontroverted material facts. Defendant's statement of uncontroverted material facts, therefore, is deemed admitted. See E.D.Mo. L.R. 4.01(E)("All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."). In contrast, Defendant disputes several of Plaintiff's Statement of Uncontroverted Material Facts. See ECF Nos. 44, 50).

to Sedgwick Claims Management Services, Inc. ("Sedgwick"), the Claims Administrator. (DSUMF, ¶6).[2] The Plan provides that a Plan participant is eligible for benefits during the first 24 months if she is unable to perform the activities that she regularly performed when her disability began, with either her own employer or any other employer, whether in the same job capacity or another for which she has training and/or education. (Id., ¶¶9, 10). After the first 24 months of receiving long-term disability ("LTD") benefits, a Plan participant must be unable to perform "any work or service for which" the participant is "reasonably qualified[.]" (Id., ¶¶8, 11).

Plaintiff Wanda Wynn ("Wynn") was employed as an Employee Health Nurse in the Human Resources/Employee Health Division of St. Vincent. (Id., ¶13). Wynn claims she became disabled on August 12, 2006, with complaints of neck pain. (Id., ¶ 15). In September 2004, Wynn had her cervical vertebrae fused at C5 and C6. (Id., ¶18). Wynn saw Dr. Arnold Zeal for follow-up treatment on January 3, 2006. (Id.). On September 12, 2006, Dr. Zeal submitted an Attending Physician Statement to Sedgwick and found "[n]o truly objective [central nervous system] deficit. Profound depression." (Id., ¶19). Dr. Zeal advised that Wynn was unable to return to work "due to depression and pain" and recommended a "psych eval" and treatment. (Id.). On that same day, Sedgwick approved Wynn's claim for short-term disability ("STD") benefits. (Id., ¶20). Sedgwick also advised that it would be reviewing Wynn's updated medical records to determine her eligibility for benefits beyond September 30, 2006. (Id.). On October 13, 2006, Sedgwick received medical records from Baptist Medical Center, which indicated that Wynn was being treated by psychiatrist T. Carey Merritt, M.D. (Id., ¶21). Dr. Merritt noted that Wynn's "mood and emotional reactivity have improved somewhat," and recommended hospitalization for "a comprehensive

---

[2]Specifically, the Plan provides that "[i]n carrying out their respective responsibilities under the Plan, the Plan administrator and the claims administrator shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. (DSUMF, ¶7).

multidisciplinary pain management program." (Id., ¶22). At Wynn's December 12, 2006 office visit, Dr. Merritt concluded that Wynn could return to work in early February 2007 with comprehensive pain management. (Id., ¶23).

Sedgwick advised Wynn that her STD benefits would expire on February 7, 2007, and it was referring her claim to the LTD Claims Examiner for evaluation of her eligibility for LTD benefits. (Id., ¶24). On March 2, 2007, Sedgwick informed Wynn that her LTD benefits claim had been approved and that benefits would be paid under the terms of the LTD Plan beginning February 8, 2007. (Id., ¶28). On April 23, 2007, Dr. Merritt completed a Disability Mental Health Certificate for Wynn that indicated that her return to work was pending completion of a comprehensive pain program. (Id., ¶29). On July 22, 2008, Sedgwick notified Wynn that, under the terms of the Plan, her eligibility for LTD benefits would continue to be determined "in accordance with the own occupation" definition of "disability" until February 7, 2009. (Id., ¶30). Therefore, Sedgwick told Wynn that she "must be disabled to the extent described [in the Plan] definition of total disability," *i.e.*, she would be unable to perform any work or service for which she was reasonably qualified taking into consideration her training, education, experience, and past earnings. (Id.).

From August 4 through August 15, 2008, Wynn received inpatient treatment from Brooks Rehabilitation clinic ("Brooks"). (Id., ¶31). Wynn's discharge summary from Brooks noted that she had "mild decrease in cervical range of motion ... mild-to-moderate decrease in extension and right lateral bending" and pain in her right shoulder. (Id., ¶32). The report also indicated that she had no tenderness in her lower back and "had full active range of motion of the thoracolumbar spine and had intact strength and sensation as well as deep tendon reflexes throughout the upper extremities except for decrease in sensation of the tips of the fourth and fifth digits of the left hand." (Id.). From September 2 through September 17, 2008, Wynn received outpatient treatment from

Brooks. (Id., ¶34). The discharge summary from Brooks indicated the following improvements in Wynn's condition:

    a.    Neck Disability Index improved from 60% to 35% (exceeding goal of 45%)

    b.    decreased her pain from 6/10 to 2/10 (exceeding goal of 4/10);

    c.    frustration decreased from 10/10 to 0.5/10 (exceeding goal of 5/10);

    d.    anxiety decreased from 7/10 to 1/10 (exceeding goal of 3/10);

    e.    pain interference decreased from 7/10 to 2/10 (exceeding goal of 3/10); and

    f.    decreased Methadone cocktail from 22.5 mg/day to 0mg/day.

(Id., ¶35). Mark Hofmann, M.D., Medical Director of Brooks, summarized the results by stating that Wynn had shown "consistent improvement in all areas of physical performance." (Id., ¶36). Dr. Hofmann also noted that on the Beck Depression Inventory-II Wynn "obtained an initial score of 31 (which is in the severe range), and obtained a score of 11 (which is in the mild range) upon discharge." (Id., ¶37). Dr. Hofmann recommended follow-up with Dr. Merritt, Wynn's psychologist, for management of her medications, but did not indicate any follow-up treatment for physical pain. (Id.). Dr. Hofmann also noted that Wynn reported "decrease in the amount of interference in her activities by pain and has had decrease in disability as a result of her neck pain ... [s]he also reports improvement in range of motion, better coping skills, improvement in sleep, and being more alert." (Id., ¶38).

In December 2008, Sedgwick requested additional medical records from Wynn's medical providers. (Id., ¶39). On or around December 30, 2008, Abdi Abbassi, M.D., who treated Wynn for chest pains and gastro-intestinal complaints, reported that Wynn was able to return to work as of November 5, 2008. (Id., ¶40). Mark Crowe, M.D., who treated Wynn for sleep apnea, concluded that Wynn was never unable to work and stated that Wynn's neck was "supple" over the course of

several visits. (Id., ¶41). Dr. Merritt stated that, as of December 2, 2008, Wynn was feeling better and had discontinued narcotic drugs. (Id., ¶43).

On February 10, 2009, Wynn submitted to a Functional Capacity Evaluation ("FCE") with Marlo Rivers, a physical therapist in Jacksonville, FL, who was directed to pay particular attention to Wynn's "sprain of back nec/nos". (Id., ¶¶44, 45). Rivers administered several tests. (Id., ¶46). Wynn complained of pain during the Waist to Shoulder Dynamic Lift Test and the Floor to Waist Dynamic Lift Test. (Id.). Rivers, however, noted that Wynn "did not demonstrate physiological signs of increased perspiration and respiration." (Id.). Likewise, Rivers noted that Wynn's gate and posture were within normal limits. (Id., ¶47). Wynn reported tenderness in her shoulders. (Id.). Rivers, however, stated that there were no "signs of muscle spasm or guarding." (Id.). Rivers concluded that Wynn was "functionally capable of work in the SEDENTARY classification." (Id., ¶48). Rivers also indicated that Wynn acted differently when she knew she was being observed during testing as compared with other times. Rivers noted that Wynn "demonstrated pain behaviors that were verbalized and observed by teary eyes and frequent sighing during testing." (Id., ¶49). On the other hand, Wynn "was observed to have a much different demeanor after testing was terminated and she was unaware of observation than during testing with direct observation." (Id.). Wynn "was composed and talkative during post testing musculoskeletal screening without apparent signs of severe pain." (Id.). Rivers noted that Wynn terminated the testing because she claimed she was in "10/10 pain and did not want to continue." (Id., ¶50). When Rivers questioned whether Wynn needed medical assistance, she changed her complaints to 9/10 pain. (Id.). Despite these complaints, Rivers noted that Wynn's heart rate was 66 beats/minute and her blood pressure was

140/99. (Id.).³ Rivers stated that Wynn "did not demonstrate any signs of pain behaviors following termination of testing." (Id.).

On February 24, 2009, GENEX, a medical case management company, completed a LTD Transferrable Skills Analysis ("TSA"). (Id., ¶51). GENEX concluded that Wynn was qualified for a variety of positions available in the Jacksonville area. (Id.).

After reviewing the FCE, the TSA and Wynn's medical records, Sedgwick notified Wynn on February 25, 2009, that she did not qualify for LTD benefits. (Id., ¶52). Specifically, Sedgwick stated that Wynn did not qualify for LTD benefits beyond February 7, 2009, because she did not meet the definition of disabled, under which she would be "unable to perform any work or service" for which she was "reasonably qualified" taking into consideration her "training, education, experience and past earnings." (Id.). Sedgwick also advised Wynn that she had a right to appeal this determination. (Id.).

Wynn appealed the denial of additional LTD benefits on March 18, 2009. (Id., ¶54). In support of her appeal, Wynn submitted a Physical Residual Functional Capacity Questionnaire ("Questionnaire") completed by Dr. Solomon, which was dated April 22, 2009. (Id., ¶57; Plaintiff's Motion, p. 6). Dr. Solomon opined that, during a typical work day, Wynn would experience pain or other symptoms severe enough to interfere constantly with attention and concentration, making her unable to perform even simple work tasks. (Plaintiff's Motion, p. 6). Dr. Solomon further stated that Wynn could sit, stand and walk less than two hours total in an eight-hour workday; that she would be required to take unpredictable, unscheduled breaks; that she could occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds or more; and that she would be expected to be absent from work an average of more than four days per month. (Id., pp. 6-7). The Questionnaire

---

³Wynn claims that her blood pressure was 152/102. (Plaintiff's Dispositive Motion for Final Summary Judgment ("Plaintiff's Motion"), ECF No. 44, p. 7).

does not indicate whether it was completed after a physical exam, physical therapy testing, or any other objective testing procedure. (DSUMF, ¶58).

On May 14, 2009, Wynn submitted a statement to Sedgwick criticizing the FCE performed on February 10, 2009. (Plaintiff's Motion, p. 7). Wynn admonished the therapist who conducted the FCE for having her perform activities that caused her extreme pain and then ignoring her pain complaints. (Id.). Wynn complained that the FCE was flawed because the test does not measure pain, which is what "gets [her] down." (Id.). Wynn asserted that it took her several days to recover from the FCE. (Id., pp. 7-8). Wynn also submitted medical records from Dr. Gabriel. (DSUMF, ¶60). On April 27, 2009, Dr. Gabriel performed a discectomy at C4-C5 and fused her cervical vertebrae from C4 through C7 to help relieve neck pain. (Id., ¶¶62, 63).[4] Dr. Gabriel's records note that Wynn experienced no complications from the surgery and "[o]n postoperative day #1, the patient had resolution of her arm pain and minimal incisional discomfort." (Id., ¶64).

Sedgwick referred Wynn's appeal to Network Medical Review Co., which provided Wynn's medical records to two independent specialist advisors for review: Robert Petrie, M.D., and Lawrence Albers, M.D. (Id., ¶65). On July 6, 2009, Dr. Petrie, a board certified occupational and environmental medicine physician and a diplomat of the American Board of Preventative Medicine, issued findings based upon his review of Wynn's medical records and his conversations with Wynn's treating physicians, including Drs. Abbassi and Solomon. (Id., ¶¶66-69). Based upon his review, Dr. Petrie concluded that Wynn was temporarily disabled due to her April 27, 2009 surgery through June 1, 2009, but that there was "no basis to conclude that [Wynn] was disabled from any occupation for which she was suited from 02/08/09 through 04/49/09 and from 06/02/09 to the

---

[4] A discectomy is a "surgery to remove herniated disc material that is pressing on a nerve root or the s p i n a l c o r d " , http://www.webmd.com/back-pain/discectomy-or-microdiscectomy-for-a-herniated-disc (last visited Mar. 20, 2012).

present." (Id., ¶71). Dr. Petrie noted that Wynn "had chronic neck pain complaints for years; however, the medical records do not document the presence of neuromuscular impairments, which would preclude the performance of any occupation prior to the surgery of 4/27/09." (Id., ¶72). Dr. Petrie explained that "the previous attending neurosurgeon indicated that in his opinion, the patient did not require additional surgery. The presurgical findings reported prior to 04/27/09 did not identify specific impairments which would interfere with the pursuit of any occupation." (Id., ¶73). Thus, aside from the temporary post-operative disability through June 1, 2009, Dr. Petrie did not find any basis for concluding that Wynn was unable to work. (Id.). On August 25, 2009, Dr. Petrie issued a supplemental report that addressed the FCE and TSA. (Id., ¶74). In the supplemental report, Dr. Petrie found that "[t]here are no demonstrated impairments that would preclude functioning at a level as indicated in the [FCE]" and that there "were no specific limitations identified which would limit performance in a sedentary capacity." (Id., ¶75).

On July 6, 2009, Dr. Albers, a diplomat with the American Board of Psychiatry and Neurology, issued findings based upon his review of the medical records. (Id., ¶76).[5] Based upon his review of the FCE, TSA and medical records, Dr. Albers concluded that Wynn was not disabled based upon any psychiatric disorder as of February 8, 2009 to the present. (Id., ¶77). Dr. Albers noted that Dr. Merritt's medical records did not include any specific mental status exam, a diagnosis of psychiatric condition, or treatment for psychiatric condition. (Id., ¶¶78, 79).

On October 2, 2009, Sedgwick notified Wynn that, based upon its medical file review, the independent reviews of Drs. Petrie and Albers, and the results of the FCE and TSA, it had determined that Wynn was not qualified for continued LTD benefits under the Plan as of February

---

[5]Dr. Albers also attempted to contact Dr. Merritt but was unable to reach him. (Id., ¶76).

8, 2009 and denied her appeal. (Id., ¶80). On May 18, 2010, Plaintiff filed this Complaint for LTD benefits under ERISA. (ECF No. 1).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 258. "[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006) (citing Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005)).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331, n.2. The Court's function is not to weigh the evidence but to

determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## DISCUSSION

A.  **DISCRETION STANDARD**

If "the Plan reserves discretionary power to construe terms or make eligibility determinations, the administrator's decision is reviewed for an abuse of discretion." Carrow v. Std. Ins. Co., 664 F.3d 1254, 1258 (8th Cir. 2012)(citing Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010)); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989); Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1050 (8th Cir. 2011). "In reviewing for an abuse of discretion, the administrator's decision should be reversed 'only if it is arbitrary and capricious.'" Green, 646 F.3d at 1050 (citing Midgett, Midgett v. Wash. Group Int'l Long Term Disability Plan, 561 F.3d 887, 893 (8th Cir. 2009))(internal quotation marks and citation omitted). The administrator's decision should be affirmed if it is reasonable, meaning it is supported by substantial evidence. Groves v. Metro. Life Ins. Co., 438 F.3d 872, 875 (8th Cir. 2006). Substantial evidence is more than a scintilla but less than a preponderance. Green, 646 F.3d at 1050; Midgett, 561 F.3d at 897. "'The requirement that the plan administrator's decision be reasonable should be read to mean that a decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.'" Midgett, 561 F.3d at 897 (quoting Jackson v. Metro. Life Ins. Co., 303 F.3d 884, 887 (8th Cir. 2002)) (emphasis in original; internal brackets omitted); see also Groves, 438 F.3d at 875 (quoting Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 807 (8th Cir. 2002)) (same).

Because the Policy in this case gave the Plan administrator discretionary authority to determine a participant's eligibility for benefits and to interpret the Plan, Sedgwick's decision to terminate Wynn's LTD benefits is subject to an abuse of discretion standard. See also Plaintiff's Motion, p. 10 (acknowledging that the Court's review is limited to the arbitrary and capricious standard).

## B.     SEDGWICK DID NOT ABUSE ITS DISCRETION

The Plan administrator did not abuse its considerable discretion in this case. Eighth Circuit precedent provides that the Plan administrator may rely upon the reports of consulting, non-examining physicians over the reports of treating physicians. Carrow, 664 F.3d at 1259(citing Weidner v. Federal Express Corp., 492 F.3d 925, 930 (8th Cir. 2007)). Based upon the record before it, Sedgwick had more than a scintilla of evidence to support its decision that Wynn's condition did not render her "disabled" under the Plan's definition to qualify for LTD benefits. As discussed herein, Sedgwick's decision was supported by substantial evidence and "a reasonable person *could* have reached a similar decision". Green, 646 F.3d at 1050 (emphasis in original); Midgett, 561 F.3d at 897.

First, Wynn argues that Sedgwick's reliance on the FCE and the TSA to deny benefits was unreasonable. Wynn asserts that the reliability of the FCE is questionable because it is "self generated" and because of the difficulties she had during the evaluation, as outlined in her May 14, 2009 statement. (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition"), ECF No. 48, p. 1; Plaintiff's Motion, p. 11). Wynn argues that a reasonable Plan administrator would not have found the FCE credible given the great difficulty Wynn had performing the FCE testing. (Plaintiff's Opposition, p. 2). In addition, Wynn discredited the February 20, 2009 TSA as untrustworthy because the vocational case manager that performed the TSA "merely assumed that Ms. Wynn could perform at a sedentary level of employment based

on the questionable FCE." (Plaintiff's Motion, p. 12). Thus, Wynn asserts that the conclusion of the TSA is dubious, given the unreliable FCE upon which the TSA was based. (Id.).

The Court finds that the FCE and the TSA provide sufficient support for Sedgwick's finding that Wynn was not disabled under the Plan's definition for LTD benefits. First, the evidence demonstrates that the FCE was not "self-generated," but was performed by a physical therapist employed by UNIVAL, a third party contractor not affiliated with Sedgwick. See Ascension Health's Reply Brief in Support of its Motion for Summary Judgment ("Reply"), ECF No. 51, p. 4). Similarly, the evidence does not indicate that the "only evidence supporting denial of benefits at or near the time of denial" was the FCE. (Plaintiff's Opposition, p. 1). Sedgwick credited the consultant reports as well as the reports of several treating physicians.

The Eighth Circuit has held that a FCE "alone constitutes more than a scintilla of evidence" when the FCE concludes a benefits claimant does not meet an ERISA plan's "disability" definition. Green, 646 F.3d at 1051; Jackson, 303 F.3d at 888. "An FCE provides 'objective clinical evidence' regarding how a benefits claimant's medical conditions affect his or her ability to work." Green, 646 F.3d at1051 (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)). Rivers' findings in the FCE were supported by objective evidence based upon a series of tests he performed on Wynn. In response, Wynn simply points to a self-serving letter, prepared four months after the FCE was performed and two months after the denial of her benefits, outlining her criticisms of the FCE testing.[6] The Court finds that Wynn's after-the-fact critique of the FCE testing and results are not sufficient to demonstrate that Sedgwick's decision was arbitrary and capricious.

---

[6]Rivers, who performed the FCE, seemed to anticipate Wynn's complaints about the results of the FCE. He noted that Wynn's behavior changed, depending upon whether she thought she was being evaluated. In addition, Wynn did not experience any physiological changes that would reflect the extreme pain she reported.

- 12 -

Manning, 604 F.3d at 1041 (it is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence). Rather, the FCE and TSA provide substantial evidence to support the finding that Wynn was not disabled under the Plan's definition.

Second, Wynn argues that the opinion of Dr. Petrie, who found that Wynn was not disabled from any occupation between February 8, 2009 and the date of Wynn's surgery on April 26, 2009, or from June 1, 2009 to the present, was unreasonable. (Plaintiff's Motion, p. 12). Wynn claims Dr. Petrie's opinion was flawed because he failed to credit important information in the Administrative Record between the February 25, 2009 denial and the April 27, 2009 surgery including: (1) Dr. Soloman's March 10, 2009 office note that indicated that Wynn had persistent neck pain radiating down the left arm, with numbness extending into the hand; (2) a March 26, 2009 cervical MRI evidencing multilevel degenerative disc and spine disease, areas of central canal stenosis most severe at C4-C5, and multi focal areas of foraminal narrowing; (3) a March 28, 2009 SSA decision finding Wynn disabled from work since August 12, 2006; (4) Dr. Gabriel's March 31, 2009 office note, indicating that Wynn had weakness in grip strength and spasm in the front of her neck, symptoms of neck pain, left shoulder pain, left forearm tingling, tingling in the tips of her finger, and left hand numbness; and (5) Dr. Solomon's April 22, 2009 Questionnaire, indicating that, based upon clinical and objective findings, including an MRI, nerve conduction studies and myelogram,[7] Wynn is disqualified from employment, even on a sedentary basis. (Plaintiff's Motion, pp. 12-13; Plaintiff's Opposition, p. 2).

Wynn also argues that Dr. Petrie's opinion that she could return to work on June 2, 2009, six weeks after surgery, was unreasonable. (Plaintiff's Motion, p. 13). On September 4, 2009, Dr.

---

[7] A "myelogram uses X-rays and a special dye called contrast material to make pictures of the bones and the fluid-filled space (subarachnoid space) between the bones in your spine (spinal canal). WebMD, http://www.webmd.com/back-pain/myelogram-16147, last visited Mar. 21, 2012.

Merritt noted that Wynn had received treatment at Brooks, but remained debilitated and unable to maintain concentration or multi-task. (Id., pp. 13-14). Wynn argues that no medical documentation indicated that her condition was improved as of June 2, 2009. (Id., p. 14).

The Court finds that Dr. Petrie's independent review[8] affords substantial support for Sedgwick's denial of Wynn's LTD benefits claim. Dr. Petrie reviewed Wynn's entire medical record and concluded Wynn was capable of working in a sedentary job. Dr. Petrie, when possible, even spoke to Wynn's attending physicians. Based upon the medical records and his conversations with Wynn's physicians, Dr. Petrie could not identify any impairments that would preclude Wynn performing sedentary work. Although Wynn claims that Dr. Petrie did not credit her March 2009 MRI, Dr. Gabriel's March 31, 2009 office note, or Dr. Solomon's April 22, 2009 Questionnaire, Dr. Petrie's report indicates that he considered all of these factors when he determined that Wynn was not disabled under the Plan. See Ascension Health's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Defendant's Opposition"), ECF No. 49, pp. 9-10). Wynn argues that Dr. Petrie did not "credit" this evidence, but Dr. Petrie's weighing of some evidence greater than others does not make his opinion, or the Plan administrator's adoption of Dr. Petrie's report, unreasonable. See, e.g., Carrow, 664 F.3d at 1259 (plan administrator "was within its discretion to make comparisons and credibility assessments among the reports of treating physicians"). Dr. Petrie's report indicates that he considered all of the evidence and his opinion provides substantial evidence to support for Sedgwick's decision. Green, 646 F.3d at 1051; Carrow, 664 F.3d at 1259 (The reports of the consulting physicians and treating physicians constitute substantial evidence supporting the Plan administrator's decision.).

---

[8] See Carrow, 664 F.3d at 1259 ("None of these doctors had a financial tie to Standard, ameliorating the effect of the conflict of interest in this case.").

In addition, the Court disagrees with Wynn's contention that the record contains no medical documentation that her medical condition was improved as of June 2, 2009. (Plaintiff's Motion, p. 14). Dr. Petrie determined that Wynn would no longer be temporarily disabled from her April 27, 2009 neck surgery as of June 2, 2009. (Defendant's Opposition, p. 12). Dr. Petrie noted in his report that a "reasonable duration of disability would be for six weeks postoperatively." (ECF No. 37, Administrative Record #1384). As additional support for Dr. Petrie's finding that she was not disabled as of June 2, 2009, Wynn's surgeon, Dr. Gabriel, noted on the first day post-operation that Wynn "had resolution of her arm pain and minimal incisional discomfort." (DSUMF, ¶64).[9] Thus, the Court finds that a reasonable person could have reached the Plan administrator's decision based upon this evidence.

Wynn also criticizes the "great weight" that Defendant places on Wynn's completion of Brooks' pain management program in August 2008 because it occurred "at a time not relevant to the denial of the benefits in this case," *i.e.*, February 8, 2008. (Plaintiff's Opposition, p. 1). Plaintiff claims that the Plan administrator's reliance on Wynn's completion of the pain management program constitutes abuse of discretion.

The Court finds Wynn's performance at Brooks to be relevant to the Sedgwick's finding that she did not suffer from a disability. Wynn participated in an inpatient program from August 4-August 15, 2008 and an outpatient program from September 2-September 17, 2008. During her treatment, Wynn exceeded all of her treatment goals and was able to discontinue using opiates for pain management. In keeping with this success, Dr. Merritt also reported in December 2008 that Wynn had improved and that she remained off of narcotic pain medication. Wynn's completion of

---

[9]In addition, Defendant notes that whether Wynn was disabled as of June 2, 2009 is of no significance when determining whether she met the definition of disability as of February 8, 2009, and was eligible for continued LTD benefits. (Defendant's Opposition, p. 12).

a pain management during the fall of 2008 is relevant to the Plan administrator's denial months later, in February 2009, particularly when one of Wynn's doctors noted her continued success in December 2008. The Court finds that the Plan administrator's consideration of the Brooks records and Wynn's success in controlling her pain were proper for consideration and provide a sufficient basis for the Plan administrator's determination.

Finally, Wynn criticizes the fact that Defendant gave no weight to the SSA's determination that she was disabled. (Plaintiff's Motion, p. 14 (noting that a SSA determination is not dispositive but can be considered by the plan administrator); Plaintiff's Opposition, p. 2).

While the Social Security Administration (SSA) found that Wynn was disabled within the meaning of its regulations, "Plan administrators are not bound by SSA findings of disability." Carrow, 664 F.3d at 1259 (citing Rutledge v. Liberty Life Assurance Co. of Boston, 481 F.3d 655, 660 (8th Cir. 2007). Here, Sedgwick determined that Wynn was not entitled to a continuation of LTD benefits because she was not disabled as of February 8, 2009. The SSA award to Plaintiff was issued on May 28, 2009. Thus, based upon the timing of the Plan administrator's denial and the SSA award, the SSA determination could not have provided a basis for determining whether Wynn had a disability under the Plan's definition.

Defendant further points out that Wynn was granted SSA benefits, at least in part, due to her psychiatric condition, *i.e.*, "major depression." Reply, p. 6. Wynn, however, acknowledges that she "was not disabled from a psychiatric standpoint during the periods of denied benefits which are the subject of this lawsuit." (Plaintiff's Motion, p. 8, n.1). Therefore, the Plan administrator could have reached a different decision than the SSA because Sedgwick did not consider Wynn's "major depression." The finding of disability by the SSA does not make Sedgwick's determination of disability unreasonable.

Thus, the Court finds that Sedgwick did not abuse its discretion in determining that Plaintiff was not eligible for continued LTD benefits as of February 8, 2009 because she did not satisfy the definition of disability. Sedgwick's determination was supported by the FCE, the TSA, and the independent reports of Drs. Petrie and Albers. In contrast, Plaintiff's complaints do not make Sedgwick's decision unreasonable. The Court finds that a reasonable person could have made the same decision based upon the evidence presented.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Dispositive Motion for Final Summary Judgment (ECF No. 44) is **DENIED** and Ascension Health's Motion for Summary Judgment (ECF 45) is **GRANTED**.

An appropriate judgment is filed simultaneously herewith in accordance with the foregoing.

Dated this 12th day of April, 2012.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE